UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 10 CR 747-3 |
| vs. | ) | Judge Joan Humphrey Lefkow |
| | ) | |
| ANTONIO EVANS | ) | |

**MOTION OF THE UNITED STATES TO ADMIT EVIDENCE
PURSUANT TO FED.R.EVID. 801(d)(2)(E)**

The UNITED STATES OF AMERICA, by its attorney, GARY S. SHAPIRO, Acting United

States Attorney for the Northern District of Illinois, moves this Court to admit certain statements

against defendant Antonio Evans pursuant to Fed. R. Evid. 104(a), 801(d)(2)(E) and *United States*

*v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I.  **INTRODUCTION**

This submission begins by providing an overview of the conspiracy that will be established

at trial. It then discusses the law governing the admissibility of coconspirator statements under Rule

801(d)(2)(E), and outlines some of the evidence establishing the conspiracy in this case. Finally, it

summarizes the evidence supporting the admission of coconspirators' statements. Based on the

following, the government seeks admission of statements pursuant to Rule 801(d)(2)(E) and requests

a pretrial ruling of admissibility from the Court, in accord with *United States v. Santiago*, 582 F.2d

1128, 1130-31 (7th Cir. 1978) and established practice in this Circuit. *See United States v. Alviar*,

573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

## II.  **OVERVIEW OF THE CHARGED CONSPIRACY**

The indictment charges defendant with conspiracy to commit kidnapping, in violation of

Title 18, United States Code, Section 1201(c) (Count One) and kidnapping, in violation of Title 18,

United States Code, Section 1201(a)(1). More specifically, the indictment alleges that beginning no early than in or about early April 2010, and continuing until at least April 25, 2010, in Cicero and Chicago, in the Northern District of Illinois, defendant Antonio Evans, along with co-defendants Jerry Zambrano and Jose Lopez, did conspire with each other and others to knowingly and unlawfully seize, confine, kidnap, abduct, carry away, and hold for ransom or reward another person, namely Minor A, and to use means, facilities, and instrumentalities of interstate commerce in committing and in furtherance of the offense, namely, telephones operated on the interstate network of AT&T, a telephone service provider.

## III.   GOVERNING LAW

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy [or joint venture] existed; (2) defendant and the declarant were members of the conspiracy [or joint venture]; and (3) the statements were made during the course and in furtherance of the conspiracy [or joint venture]. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

### 1.   Existence of and Membership in the Conspiracy

Under *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), the trial judge must preliminarily determine whether statements by a coconspirator of the defendant will be admissible

---

[1] No Sixth Amendment confrontation issues are posed by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant. Such statements are not testimonial, and therefore are not subject to the Confrontation Clause. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination the judge must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Id*. at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If the Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: 1) a conspiracy existed; 2) the defendant and declarant were members of the conspiracy; and 3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, e.g., United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid.801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).

While the Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, *United States v. Bourjaily*, 483 U.S. 171, 178, 180 (1987); *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[2]

There is no requirement, for admissibility under Rule 801(d)(2)(E), that the government establish all elements of "conspiracy" such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be

---

[2] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c). Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant was out of cocaine was not hearsay because it was not offered for its truth but as evidence of membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) ("war stories" about the drug trade were not offered for the truth); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value in establishing knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set forth scope of the anticipated conspiratorial scheme).

tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-550; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator or schemer. *Longstreet*, 567 F.3d at 919; *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001).

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A conspirator who has become inactive or less active in the conspiracy nevertheless is liable for his conspirators'

further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

## 2. The "In Furtherance of" Requirement

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630 *2-3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th

Cir. 2009) (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

– to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000);[3]

– to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), abrogated on other grounds by *United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

– to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545;

– to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

– as an assurance that a coconspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

– to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

– to control damage to an ongoing conspiracy, *United States v. Johnson,* 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro,* 877 F.2d 1341, 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

---

[3] Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

– to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

– to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

– to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

– "describing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992).

– to reveal the nature and objective of the conspiracy, *United States v. Tuchow*, 768 F.2d 855, 869 (7th Cir. 1985).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 Fed. Appx. 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility."*).*

## IV.  THE EVIDENCE REGARDING THE EXISTENCE OF THE CHARGED CONSPIRACY AND DEFENDANT'S PARTICIPATION IN THE CONSPIRACY

At trial, the government's evidence will establish that the defendant conspired with Zambrano and Lopez to knowingly and unlawfully seize, confine, kidnap, abduct, carry away, and hold for ransom or reward Minor A, and to use means, facilities, and instrumentalities of interstate commerce in committing and in furtherance of the offense.  As set forth below, the evidence that

8

proves the existence of this conspiracy is strong and meets the preponderance of the evidence standard applicable at this stage of the proceedings.[4]  The evidence includes expected witness testimony from individuals including co-defendant Jose Lopez, Minor A, and Minor A's father, recorded ransom calls, and information obtained from phone records for Zambrano, Lopez, and Evans.

**Minor A**

The government expects Minor A to testify at trial that on April 23, 2010, while he was walking to school in the morning, two African-American males grabbed him and placed him inside a Ford Expedition.  Minor A is expected to testify that right after the individuals grabbed him, they placed a jacket on his head so that he could not see anything.  Minor A was then driven to a location where he was taken into a basement.  In the basement, Minor A's captors told Minor A to sit on a couch and face a wall.

Minor A is expected to testify that at some point while he was in the basement, additional individuals entered the basement, and he was allowed to speak to his father using a cellular telephone provided to him by one of his captors.  Minor A is further expected to testify that at some later point, his captors again put a jacket over his head, placed him inside a car, and drove him to an alley, where they released him.

---

[4] The government is not detailing all of its evidence that would go to show the existence of the conspiracy or defendant's and other declarants' participation in it. Rather, this proffer highlights for the Court some of the government's evidence in order to establish, by a preponderance of the evidence, the existence of the conspiracy and the roles of the various conspirators. Thus, this proffer does not list all of the government's witnesses, nor does it provide all of the evidence that will be presented by those witnesses who are named.

### Minor A's father

The government also expects Minor A's father to testify as a witness at trial. Minor A's father is expected to testify that, beginning on April 23, 2010, and continuing to April 24, 2010, he received ransom calls from unknown individuals demanding money for Minor A's safe return. Minor A's father is expected to testify that he received the first ransom call at approximately 4:00 p.m. on April 23, 2010. The government expects Minor A's father to testify that, after he received this ransom call, he contacted the police.

At trial, the government intends to present evidence of additional ransom calls made to Minor A's father following this initial call. The government intends to present evidence that these ransom calls were all made from AT&T pay phones located at various areas of Chicago that operate on AT&T's interstate network. The government also plans to introduce tapes of some of the calls that law enforcement officers were able to record.

### Co-defendant Jose Lopez

Co-defendant Jose Lopez is expected to be a government witness at trial. Lopez is expected to testify that he knew co-defendant Jerry Zambrano because the two worked together at a business. The government expects Lopez to testify that in early April 2010, he and Zambrano agreed to take part in a kidnapping and ransom in an effort to obtain money. Lopez is expected to testify that Zambrano recruited Evans to join the conspiracy because they needed help in completing the kidnapping and ransom.

Lopez is expected to testify that at some point in early April 2010, he, Zambrano, Evans, and another African-American male that Evans recruited ("Co-conspirator A") drove to the victim's house in Cicero, Illinois. At that location, Lopez and Zambrano pointed out to Evans and Co-

conspirator A the victim who was to be kidnapped. Lopez is also expected to testify that Evans and Co-conspirator A staked out the victim's house on several other occasions to determine the victim's route to school and to determine when was the best time to kidnap the victim.

Lopez is expected to testify that he, Zambrano, and Evans decided on a day to conduct the kidnapping, but on that date, Co-conspirator A did not show up. Lopez is expected to testify that he later received a call from Zambrano saying that Evans found another person to take part in the kidnapping. Lopez is expected to testify that he, Zambrano, and Evans then drove this new co-conspirator ("Co-conspirator B") to the victim's house in Cicero.

Lopez is expected to testify that, on April 23, 2010, the date of the kidnapping, he borrowed a black Ford Expedition from one of his wife's relatives. Lopez is expected to testify that he picked up Evans and Co-conspirator B in Maywood. Lopez is expected to testify that he drove Evans and Co-conspirator B to the victim's house and they waited for the victim to walk to school. The government expects Lopez to testify that Evans and Co-conspirator B were standing outside the Ford Expedition pretending to stretch when the victim walked by. Lopez is expected to testify that Evans and Co-conspirator B grabbed the victim and forced him into the car. Lopez is expected to testify that they placed a jacket or sweater over his head.

Thereafter, Lopez is expected to testify that he began driving away and that Evans gave him directions to a house on the south side of Chicago. The government expects Lopez is testify that when they arrived at the house, Evans and Co-conspirator B took the victim inside the house. Lopez then went to work.

The government further expects Lopez to testify that on the next morning, April 24, 2010, he met up with Zambrano and they made ransom calls to the victim's father. Lopez is expected to

11

testify that he and Zambrano went to the house where Evans was holding the victim because the victim's father wanted to speak to his son. At that location, Lopez is expected to testify that he and Zambrano met Evans and Co-conspirator B in the basement of the house guarding the victim. Lopez is expected to testify that Evans bought a throw away cellular phone so that a call could be made to allow the victim to speak to his father. After making this call, Lopez is expected to testify that he and Zambrano left to make more ransom calls while Evans and Co-conspirator B stayed in the basement guarding the victim. Lopez is expected to testify that he and Zambrano drove around to various areas of Chicago and made a number of ransom calls to the victim's father.

Lopez is further expected to testify that while he and Zambrano were making ransom calls, a location was agreed upon for Minor A's father to drop ransom money. Lopez is expected to testify that at that location, Zambrano got out of the car and walked around, but got back in the car shortly thereafter because Zambrano said the cops were around. Lopez is expected to testify that the cops began following them, but that Zambrano was able to lose them. Zambrano then dropped Lopez off at his car. Lopez is also expected to testify that at some point after Zambrano dropped him off, Zambrano called him to say that Evans let the victim go.

### Analysis of Phone Records

The government expects to present evidence about and analysis of phone and cell site records obtained for phones connected to Zambrano, Evans, and Lopez through subscriber records and other testimony. The government presents below a sample of some of the phone and cell site evidence it intends to seek to admit at trial that helps further prove the charged conspiracy in this case.

12

*Calls between Lopez, Evans, and Zambrano*

The government expects to present evidence that from April 23, 2010, to the day after Minor A was release on April 25, 2010, there were numerous calls among various phone numbers connected to Lopez, Evans, and Zambrano.

*Calls on the morning of the kidnapping*

The government expects to present evidence showing that on the morning of the kidnapping, from approximately 6:22 a.m. to 6:53 a.m., a phone that records show was subscribed to by Evans ("Evans' Phone") called a phone that records show was subscribed to by Lopez ("Lopez Phone 1") four times, and received one call from that number. Phone records also show that a separate phone connected to Lopez ("Lopez Phone 2")[5] called Evans' Phone at approximately 7:06 a.m. The phone records show two additional calls between Evans' Phone and Lopez Phone 2 at 9:43 a.m., approximately one hour after the kidnapping took place.

*Cell site records for calls on the morning of the kidnapping*

At trial, the government intends to introduce cell site records for phones connected to Lopez, Evans, and Zambrano. Evidence the government intends to introduce at trial will establish that cell site records reflect the location of the cell tower and antenna face used at the start and end of a cellular telephone call.

In this case, Evans' Phone records reflect that his phone was used at 7:54 a.m. and 7:55 a.m. on April 23, 2010, approximately one hour before the kidnapping. The government expects to present evidence that each of those calls used a cell tower in Cicero, Illinois, located at

---

[5] Phone subscriber records show that Lopez Phone 2 is subscribed to a name and address in Irvine, California, that is the default address for a prepaid phone operating on Sprint Nextel's network. The government expects Lopez to testify that this was one of the phones that he used.

approximately Cermak Street and Lombard Avenue, which tower is the closest tower to the kidnapping location.

Similarly, cell site records for Lopez Phone 1 show that this phone was used at 8:15 a.m. on April 23, 2010, approximately a half hour before the kidnapping. The cell tower used for this call is the same cell tower mentioned above at Cermak Street and Lombard Avenue in Cicero, Illinois, the closest tower to the kidnapping location.

*Ransom call at 12:59 p.m.*

The government also expects to present evidence that the cellular phone used for the 12:59 p.m. ransom call made from the basement of the location where Minor A was being held operated on the network of Cricket. Cell site records the government plans to introduce at trial show that the cellular tower used for this call was located on Chicago's south side at approximately 805 W. 58th Street.

Furthermore, records for Lopez Phone 2 show a call to Evans' Phone at approximately 12:54 p.m., five minutes before the 12:59 p.m. ransom call. The cell tower used for the 12:54 call between Lopez and Evans was located at approximately 59th Street and Francisco Avenue on Chicago's south side. The cell tower at 59th Street and Francisco is approximately two and one-half miles west of the tower at 805 W. 58th Street that the Cricket phone used for the ransom call from the basement of the location where Minor A was being held.

Similarly, records for Evans' Phone show that his cell phone was used ten times between 12:54 p.m. and 1:12 p.m. on April 24, 2010, around the time that the 12:59 p.m. ransom call was made to Minor A's father. Cell site records for Evan's Phone show that during this time period, Evans' Phone used cell towers located at approximately 58th Street and Ada Street and 59th Street

14

and Francisco Avenue in Chicago. The cell tower at 58th Street and Ada Street is approximately one-half mile west of the tower at 805 W. 58th Street that the Cricket phone used for the ransom call from the basement of the location where Minor A was being held. As noted above, the cell tower at 59th Street and Francisco is approximately two and one-half miles west of the tower at 805 W. 58th Street.

### Location where Minor A was being held

The government intends to present evidence that Minor A was held in the basement of a residence on Seeley Street in Chicago, Illinois. The government also expects to present evidence that Evans' relatives reside at that residence. More specifically, the government intends to present evidence that on August 13, 2011, Minor A and FBI Agents assigned to this matter went to into the basement of the residence in question. While in the basement, Minor A recognized the basement as the one in which he was held captive. Minor A also recognized many specific items in the basement, including a distinctive television. At trial, the government intends to introduce photographs of the basement taken when Minor A and FBI Agents went into the basement. The government also plans to present witness testimony establishing that the owner of the residence on Seeley Street is related to Evans.

## V.      COCONSPIRATOR STATEMENTS

The statements between the coconspirators made in furtherance of the conspiracy that the government intends to offer at trial fall into several categories, all concerning subjects that were

integral to the conspiracy and its success.[6] These statements will be introduced through recorded phone calls, testimony of a cooperating co-conspirator, and other witnesses.[7]

The coconspirator statements offered at trial will concern the subjects listed below.

**Recorded Ransom Calls**

The government intends to admit transcripts of the recorded ransom calls into evidence in this case.[8] Lopez is expected to testify that Zambrano made all of the ransom calls. The recorded calls to Minor A's father were clearly in furtherance of the conspiracy, insofar as the statements were designed to force Minor A's father to make ransom payments to the co-conspirators for Minor A's safe release.

---

[6] The government is not detailing each and every proposed coconspirator statement of each witness or document but rather a representative sample of the statements from each witness and/or document. Further, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed. Of course, the government is committed to establishing the *Bourjaily* predicates at trial and the ultimate admissibility of coconspirator statements is governed by the trial evidence.

[7] A number of out-of-court statements from these sources will be admissible without regard to the coconspirator hearsay rule, because they are statements of the defendants, statements not offered to prove the truth of the matter asserted, or for other reasons. A defendant's own statements, for example, are admissible against him pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule. *United States v. Mahonia*, 985 F.2d 869, 877 (7th Cir. 1993). The coconspirator statement rule is also not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a). This rule defines "statement" as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985).

[8] The recordings themselves are in Spanish. If stipulations as to the translation of the recordings are not agreed to by the parties, the government will present a translator who will testify that the transcripts are accurate transcriptions of the recordings.

16

**<u>Statements made to Lopez by Zambrano and Evans</u>**

As detailed above, and in the discovery materials that defendant have been provided, Zambrano and defendant made various statements to Lopez during the course of the conspiracy that were designed to further the conspiracy's objectives. Those statements should be admissible as coconspirator statements in furtherance of the conspiracy. This would include statements Zambrano made to Lopez about planning and organizing the kidnapping prior to defendant joining the conspiracy. Those statements would be admissible against defendant in order to establish the "nature and objectives of the conspiracy which he subsequently joined." *Tuchow*, 768 F.2d at 868. However, with respect to these statements between Zambrano and Lopez prior to defendant joining the conspiracy, the Court should instruct the jury that "while such statements may be used as evidence revealing the nature and objective of the conspiracy, such statements should not be used as independent evidence establishing the defendant's participation in the conspiracy." *Id.* at 869.

In addition, also admissible under this *Santiago* proffer would be Lopez's testimony about conversations Zambrano had with defendant during the kidnapping that Zambrano relayed back to Lopez. These statements made to Lopez were clearly designed to further the conspiracy's objectives and should be admitted against defendant in this case.

**<u>Statements made to Minor A and Minor A's father</u>**

Statements made to Minor A and Minor A's father by coconspirators during the kidnapping should also be admitted. The statements to Minor A would be those statements made to Minor A during the kidnapping and while he was being held ransom. The statements to Minor A's father would include statements concerning the ransom calls, particularly those calls that were not recorded.

17

In summary, as is evident from their description and as noted above, all the above statements made by coconspirators were made in furtherance of the conspiracy. Under the case law summarized above, all of these statements are properly admissible as coconspirator statements under Fed.R.Evid. 801(d)(2)(E).

## VI.  **CONCLUSION**

The United States respectfully requests that this Court find, based upon this proffer, that coconspirator statements are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted,

GARY S. SHAPIRO
Acting United States Attorney

By:     /s/ Jason A. Yonan
JASON A. YONAN
SAMUEL B. COLE
Assistant U.S. Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

Dated: August 7, 2012