# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| vs. | ) | Case No. 10 CR 747-3 |
| | ) | Judge Joan H. Lefkow |
| | ) | |
| ANTONIO EVANS | ) | |

## OPINION AND ORDER

This matter is before the court on the government's motion *in limine* to admit cell site

evidence and analysis through the testimony of Special Agent Joseph Raschke.  (Dkt. #97.)  On

August 17, 2011, defendant Antonio Evans and two co-defendants were charged with conspiracy

to kidnap in violation of 18 U.S.C. § 1201(c) (Count I) and kidnapping in violation of 18 U.S.C.

§ 1201(a)(1) (Count II).[1]  (Dkt. #41.)  The kidnapping allegedly took place on April 23 and 24,

2010.   The government proposes to call Special Agent Raschke to testify about the operation of

cellular networks and how to use historical cell site data to determine the general location of a

cell phone at the time of a particular call.  Applying a theory called "granulization," Special

Agent Raschke proposes to testify that calls placed from Evans's cell phone during the course of

the conspiracy could have come from the building where the victim was held for ransom.

On August 21 and 23, 2012, this court held an evidentiary hearing pursuant to Federal

Rule of Evidence 702 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S.

Ct. 2786, 125 L. Ed. 2d 469 (1993), to determine whether the government's proposed evidence

---

[1]  The two co-defendants, Jerry Zambrano and Jose Antonio Lopez, pleaded guilty on April 27,
2012 and August 7, 2012 respectively.  (*See* Dkt. #95, #115.)

and analysis are admissible.  After the hearing, Evans moved for disclosure of expert evidence

under Federal Rule of Criminal Procedure 16.  (Dkt. #122.)  For the reasons set forth herein, the

government's motion *in limine* (dkt. #97) will be granted in part and denied in part and Evans's

motion (dkt. #122) will be denied as moot.

## LEGAL STANDARD

The admission of lay witness testimony is governed by Federal Rule of Evidence 701,

which limits lay opinion testimony to that which is (1) rationally based on the witness's

perception; (2) helpful to clearly understanding the witness's testimony or to determining a fact

in issue; and (3) not based on scientific, technical, or other specialized knowledge within the

scope of Rule 702.  Fed. R. Evid. 701.  The admission of expert opinion testimony is governed

by Federal Rule of Evidence 702 and *Daubert*.  *See Bielskis* v. *Louisville Ladder, Inc*., 663 F.3d

887, 893 (7th Cir. 2011).  Rule 702 states that a witness who is qualified as an expert by

knowledge, skill experience, training or education may testify in the form of opinion or

otherwise provided that "(1) the expert's scientific, technical, or other specialized knowledge

will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the

testimony is based on sufficient facts or data; (3) the testimony is the product of reliable

principles and methods; and

(4) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R.

Evid. 702.  To admit expert testimony under this rule, the court must determine that (1) the

witness is qualified; (2) the expert's methodology is scientifically reliable; and (3) the testimony

will assist the trier of fact to understand the evidence or to determine a fact in issue.  *Myers* v. *Ill.

Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

2

In *Daubert* the United States Supreme Court set out four factors the court may consider when assessing the reliability of an expert's methodology, including (1) whether the theory is based on scientific or other specialized knowledge that has been or can be tested; (2) whether the theory has been subjected to peer review; (3) the known or potential rate of error and the existence of standards controlling the theory's operation; and (4) the extent to which the theory is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593–94; *see also Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 151, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

The Rule 702 inquiry "is a flexible one." *Daubert*, 509 U.S. at 594. As such, "[d]eterminations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton* v. *McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). The proponent of the testimony bears the burden of proving that the proffered testimony meets these requirements, and the Seventh Circuit grants the district court "wide latitude in performing its gate-keeping function." *Bielskis*, 663 F.3d at 894 (internal quotation marks and citation omitted).

## BACKGROUND

The government has obtained what it alleges are the call data records for the phone registered to Evans during the time of the alleged conspiracy. The data contained in these records includes the date and time of calls originating from Evans's phone, the duration of each call, and the originating and terminating cell tower (also known as cell site) used by the phone to place the call. Using these records, Special Agent Raschke testified that he could apply the granulization theory to estimate the general location of Evans's phone during the time calls were

placed.  To understand the theory of granulization it is necessary to understand how a cellular network operates.

According to Special Agent Raschke, when a cell phone is in idle mode, it regularly communicates with cell towers in its network.  Using radio frequency waves, the phone tries to determine which cell tower has the strongest signal.  In urban areas, cell towers are often located on top of buildings or water towers.  A cell tower emits radio frequency waves in all directions, providing cell phone coverage in a 360 degree radius around the tower.  Three antennas typically comprise each tower; each antenna covers a 120 degree area.  When a cell phone places a call, it typically connects to the tower in its network with the strongest signal.  This is usually the tower nearest to the phone, although a variety of factors including physical obstructions and topography can determine which tower services a particular phone.  Once the call reaches the tower, this interaction is recorded by the network provider.  The call then proceeds to a mobile switching center, which may choose to reroute the call to a different tower based on network traffic.  The call may also be rerouted to a different tower if the caller changes location during the duration of the call.  These data are recorded by the network and maintained as call data records.

To determine the location of a cell phone using the theory of granulization, Special Agent Raschke first identifies (1) the physical location of the cell sites used by the phone during the relevant time period; (2) the specific antenna used at each cell site; and (3) the direction of the antenna's coverage.  He then estimates the range of each antenna's coverage based on the proximity of the tower to other towers in the area.  This is the area in which the cell phone could connect with the tower given the angle of the antenna and the strength of its signal.  Finally,

4

using his training and experience, Special Agent Raschke predicts where the coverage area of

one tower will overlap with the coverage area of another.

Applying this methodology, Special Agent Raschke testified that he could estimate the

general location of Evans's cell phone during an 18 minute period (from 12:54 p.m. to 1:12 p.m.)

on April 24, 2010, during which time Evans's phone used two cell towers to place nine calls.

According to Special Agent Raschke, based on his estimate of the coverage area for each of the

antennas, the calls made from Evans's phone could have come from the location where the

victim was held for ransom. In support, the government proposes to admit summary exhibit 6,

which is a map of the two towers used by Evans's phone and a drawing of the estimated

coverage overlap of the two towers. The building where the victim was held falls squarely

within the coverage overlap of the two towers. (*See* Gov't Summ. Ex. 6.) In addition to this

exhibit, the government also proposes to introduce maps indicating the location of cell towers

used by Evans's phone in relation to other locations relevant to the crime (Gov't Summ. Exs.

1–5),[2] maps showing the topography of the area between the two towers indicated in summary

exhibit 6 (Gov't Summ. Ex. 7–8), and a listing of the total number of calls placed by Evans's

phone during the relevant time period that originated or terminated with one of the two towers

(Gov't Summ. Ex. 9).[3]

---

[2] Government summary exhibit 1 also contains a line from the location of one of the cell towers
used by Evans's phone to the location where the victim was kidnapped, demonstrating the close
proximity of the two locations.

[3] The government has also moved to admit the call data records under the business record
exception to the hearsay rule. *See* Fed. R. Evid. 803(6). Assuming the proper foundation is laid, these
records are likely admissible. *See United States* v. *Graham*, 846 F. Supp. 2d. 384, 389 (D. Md. 2012)
(stating that historical cell site location records are "created by cellular providers in the ordinary course of
business").

**ANALYSIS**

I.    **Admissibility of maps containing cell tower locations and other locations relevant to the crime**

As an initial matter, the government argues that a portion of Special Agent Raschke's testimony is admissible under Rule 701, specifically, his testimony concerning maps he created indicating the location of certain cell towers used by Evans's phone during the course of the conspiracy in relation to other locations relevant to the crime.  (*See* Gov't Summ. Exs. 1–5.)  The court agrees that using Google Maps to plot these locations does not require scientific, technical, or other specialized knowledge and that these exhibits are admissible through lay opinion testimony under Rule 701.

The relevancy of these exhibits, however, is primarily based on the premise that a cell phone connects to the tower in its network with the strongest signal, and the tower with the strongest signal is usually the one closest to the cell phone at the time the call is placed. Although this is the general rule, there are a variety of factors that determine the tower to which a cell phone will connect.  *See* Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, 18 RICH. J. L. & TECH. 3, at *7 (Fall 2011) (identifying factors that affect a tower's signal strength to include the technical characteristics of the tower, antennas and phone, environmental and geographical features and indoor or outdoor usage); Matthew Tart et al., *Historic cell site analysis - Overview of principles and survey methodologies*, 8 DIGITAL INVESTIGATION 1, 186 (2012) ("In a perfectly flat world with equally spaced and identical masts, a mobile phone user would generally connect to the closest mast.  In the real world, however, this is not necessarily the case.").  Indeed,

Special Agent Raschke himself testified that topography, physical obstructions and the signal strength of other towers can impact whether a cell phone connects to the tower closest to it.

Lay witness testimony is admissible under Rule 701 when it is "rationally based on [a] witness's perception" or based on "a process of reasoning familiar in everyday life." Fed. R. Evid. 701 & advisory comm. notes (2000 amends.); *see also United States* v. *Conn*, 297 F.3d 548, 554 (7th Cir. 2002) ("Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." (quoting *United States* v. *Peoples*, 250 F.3d 630, 641 (8th Cir. 2001)). Understanding how the aforementioned factors affect a cell phone's ability to connect a particular tower, however, cannot be said to be within the perception of the untrained layman. Rather, this type of understanding demands "scientific, technical, or other specialized knowledge" of cellular networks and "results from a process of reasoning which can be mastered only by specialists in the field." Fed. R. Evid. 701 & advisory comm. notes (2000 amends.); *Conn*, 297 F.3d at 554 ("Expert opinion . . . brings to an appraisal of those facts . . . that the lay person cannot be expected to possess.")[4] Special Agent Raschke may therefore provide lay

---

[4] As recently explained by the Seventh Circuit,

> [a] law-enforcement officer's testimony is a lay opinion if it is limited to what he observed . . . or to other facts derived exclusively from [a] particular investigation. On the other hand, an officer testifies as an expert when he brings the wealth of his experience as [an] officer to bear on those observations and ma[kes] connections for the jury based on that specialized knowledge.

*United States* v. *Christian*, 673 F.3d 702, 709 (7th Cir. 2012) (internal quotation marks and citations omitted); *see Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima* v. *Titan Int'l, Inc.*, 533 F.3d 555, 561 (7th Cir. 2008) ("Testimony based

(continued...)

opinion testimony concerning (1) the call data records obtained for Evans's phone and (2) the location of cell towers used by Evans's phone in relation to other locations relevant to the crime; but if he wishes to testify concerning (1) how cellular networks operate, *i.e.*, the process by which a cell phone connects to a given tower or (2) granulization theory he must first meet the demands of Rule 702 and *Daubert*.[5]

## II. Admissibility of testimony concerning how cellular networks operate and the theory of granulization under Rule 702 and *Daubert*

### A. Whether Special Agent Raschke is qualified to testify as an expert

Special Agent Raschke testified that he has been a member of the Federal Bureau of Investigation for 14 years and currently serves on the agency's Violent Crimes and Fugitive Task Force. He has received over 350 hours of training and instruction in the use of cellular phones and investigations and spends approximately 70 percent of his time in his current position analyzing cell phone records. He has instructed approximately 700 officers in basic techniques for utilizing cell phones in investigations and has been qualified as an expert in the use of historical cell site data in five state court cases in the past two years. (*See* Gov't Ex. CV.)

---

(...continued)
solely on a person's special training or experience is properly classified as expert testimony, and therefore it is not admissible under Rule 701.")

    [5] On this point, the court respectfully disagrees with those courts that have allowed law enforcement officers to provide lay opinion testimony as to how cellular networks operate or the use of call data records to determine the location of a cell phone. *See, e.g., United States* v. *Feliciano*, 300 F. App'x. 795, 801 (11th Cir. 2008) (allowing officer to provide lay opinion testimony based on his "particularized knowledge garnered from years of experience in the field," but relying on *Tampa Bay Shipbuilding & Repair Co.* v. *Cedar Shipping Co.*, 320 F.3d 1213, 1223 (11th Cir. 2003) for a position that has been called into doubt in this district, *see Chen* v. *Mayflower Transit, Inc.*, 224 F.R.D. 415, 419 (N.D. Ill. 2004)); *United States* v. *Henderson*, No. CR 10-117 BDB, 2011 WL 6016477, at **4–5 (N.D. Okla. Dec. 2, 2011) (allowing agent to provide lay opinion testimony that cell phone records "identif[y] the cell tower that was nearest to the location of the cell phone at the time a particular call was made or received").

Special Agent Raschke testified that he has received training from Sprint-Nextel on how their cellular network operates and is familiar with the operation of this and similar networks. He also stated that he has successfully used historical cell site data on a number of occasions to locate people (both dead and alive) in the course of other FBI investigations.

Based on this testimony, the court is satisfied that Special Agent Raschke is qualified to testify as an expert concerning the operation of cellular networks and granulization theory. *See United States* v. *Allums*, No. 2:08–CR–30 TS, 2009 WL 806748, at **2–3 (D. Utah Mar. 24, 2009) (holding that FBI agent was qualified to provide expert testimony on historical cell site analysis where he underwent two official FBI training courses on how cell technology and cell networks function, five training courses on radio frequency theory, and was obtaining a master's degree in geospatial technology); *see also United States* v. *Schaffer*, 439 F. App'x. 344, 347 (5th Cir. 2011) (finding that lower court did not err in allowing FBI agent to provide expert testimony where agent taught courses on historical cell site analysis, his students had qualified as experts, and he had used the technique without error on at least 100 occasions).

> **B.     Whether Special Agent Raschke's testimony concerning how cellular networks operate is admissible under Rule 702**

Rule 702 instructs that when a qualified expert provides testimony regarding general principles, without trying to apply those principles to the facts of the case, the expert's testimony need only (1) address a subject matter on which the factfinder can be assisted by an expert; (2) be reliable; and (3) "fit" the facts of the case. Fed. R. Evid. 702 advisory comm. notes (2000 amends.). Here, testimony concerning how cellular networks operate would be helpful because it would allow the jury to narrow the possible locations of Evans's phone during the course of the conspiracy. Although Special Agent Raschke is not an engineer and has never worked for a

network provider, he has received extensive training on how cellular networks operate and is in regular contact with network engineers. He also spends a majority of his time analyzing cell site records, which requires a thorough understanding of the networks themselves. The court concludes that his testimony on this subject is reliable. Finally, it is undisputed that a phone registered to Evans used certain cell towers to place a number of calls during the course of the conspiracy and, as such, Special Agent Raschke's testimony on this topic fits squarely within the facts of this case.[6]

C. **Whether Special Agent Raschke's testimony concerning the theory of granulization is admissible under Rule 702**

Special Agent Raschke testified that using a theory of granulization he can estimate the range of certain cell sites based on a tower's location to other towers. This in turn allows him to predict the coverage overlap of two closely positioned towers. Special Agent Raschke testified that he has used this theory numerous times in the field to locate individuals in other cases with a zero percent rate of error. He also testified that other agents have successfully used this same method without error. No evidence was offered, however, beyond Special Agent Raschke's

---

[6] Evans's proposed expert, Manfred Schenk, contested Special Agent Raschke's opinion regarding which cell towers get recorded in the call data records. According to Schenk, the only cell tower that gets recorded is the tower that ultimately services the call (*i.e.*, the tower assigned by the mobile switching center, not the tower that the phone initially connects to before being routed to the mobile switching center.) This factual disagreement goes to the weight not the admissibility of Special Agent Raschke's testimony. *See, e.g., Traharne* v. *Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717, 723 (N.D. Ill. 2001) ("Factual inaccuracies are to be explored through cross-examination and go toward the weight and credibility of the evidence not admissibility." (citing *Walker* v. *Soo Line R.R. Co.*, 208 F.3d 581, 586–89 (7th Cir. 2000)). The same is true for the line connecting the location of the kidnapping to the cell tower used by Evans's phone on April 23, 2010 contained in summary exhibit 1. Evans is free to solicit on cross examination factors other than proximity that may have caused Evans's phone to connect with that particular tower.

testimony, to substantiate the FBI's successful use of granulization theory or its rate of error in the field.

Despite Special Agent Raschke's assurances, the court remains unconvinced that granulization theory is reliable. First, in determining the coverage overlap of the two towers used by Evans's cell phone on August 24, 2010, Special Agent Raschke assumed that Evans's cell phone used the towers closest to it at the time of the calls. But as previously discussed, there are a number of factors that could have caused Evans's phone to connect to these towers even though another tower was closer. For example, a building could have obstructed the phone's access to the closest tower[7] or the call could have been rerouted due to network traffic. Special Agent Raschke acknowledged these factors but did not fully account for them in his analysis. Rather, he relied on his training and experience to estimate the coverage overlap between the two. Estimating the coverage area of radio frequency waves requires more than just training and experience, however, it requires scientific calculations that take into account factors that can affect coverage. Special Agent Raschke presented no scientific calculations and did not consider a variety of relevant factors. Although the call data records upon which he relied are undisputed, the link between those records and his conclusions is deficient. *See United States* v. *Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) ("It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to

---

[7] Special Agent Raschke testified that he has driven this area many times and there are no buildings that would obstruct cell phone access to nearby towers. It is unclear when he drove this area and whether he drove it with the specific purpose of determining whether any such obstructions exist. *Cf. Allums*, 2009 WL 806748, at *1 (finding methodology reliable where agent drove around cell towers using a cell phone from defendant's provider and device called a "Stingray" to determine the approximate range of coverage for each tower).

support. . . . The court is not obligated to admit testimony just because it is given by an expert." (internal citation omitted)).

Second, the granulization theory remains wholly untested by the scientific community, while other methods of historical cell site analysis can be and have been tested by scientists. *See, e.g.*, Matthew Tart et al., *Historic cell site analysis - Overview of principles and survey methodologies*, 8 DIGITAL INVESTIGATION 1, 193 (2012) (reviewing techniques for collecting radio frequency data for historic cell site analysis and concluding that "[a]rea [s]urveys around the location of interest . . . provide the most accurate and consistent method for detecting servicing [c]ells at a location"). The Seventh Circuit has stated that "[a] very significant *Daubert* factor is whether the proffered scientific theory has been subjected to the scientific method." *Chapman* v. *Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002). This is because "the scrutiny of the scientific community . . . increases the likelihood that the substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593; *see also* Charles Alan Wright et al., 29 FEDERAL PRACTICE & PROCEDURE - EVIDENCE § 6266 (1st ed.) ("[J]udicial interference with the jury's power to weigh [expert] evidence may be warranted where expert testimony is based on emerging scientific theories that have not gained widespread acceptance within the scientific community."). Granulization theory has not been subject to scientific testing or formal peer review and has not been generally accepted in the scientific community. These factors weigh against a finding of reliability.

Given that multiple factors can affect the signal strength of a tower and that Special Agent Raschke's chosen methodology has received no scrutiny outside the law enforcement community, the court concludes that the government has not demonstrated that testimony related

to the granulization theory is reliable. As such, testimony concerning this theory, along with the estimated range of coverage for each of the towers indicated on summary exhibit 6, will be excluded under Rule 702 and *Daubert*. Because summary exhibits 7 through 9 do not contain estimated ranges of coverage, they will be admitted.

## CONCLUSION AND ORDER

To summarize, the government's motion *in limine* to admit cell site evidence and analysis (dkt. #97) is granted in part and denied in part. Special Agent Raschke is qualified to provide expert testimony concerning how cellular networks operate. Based on this testimony, summary exhibits 1 through 5 and 7 through 9 are admissible at trial. Special Agent Raschke may not testify concerning the theory of granulization, which the court finds to be unreliable. In addition, the estimated coverage areas contained in summary exhibit 6 must be removed before the court will admit this exhibit. Evans's motion for disclosure of expert evidence under Rule 16 (dkt. #122) is denied as moot.

Dated: August 29, 2012                                   Enter: _Joan H. Lefkow_
                                                         JOAN HUMPHREY LEFKOW
                                                         United States District Judge