```
1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3
   UNITED STATES OF AMERICA,        )
4                                   )
              Plaintiff,            )
5                                   )
              vs.                   )  No. 10 CR 747-3
6                                   )
   ANTONIO EVANS,                   )  Chicago, Illinois
7                                   )  August 23, 2012
              Defendant.            )  10:25 A.M.
8
        TRANSCRIPT OF PROCEEDINGS - Continued Daubert Hearing
9          BEFORE THE HONORABLE JOAN HUMPHREY LEFKOW

10 APPEARANCES:

11 For the Government:        HON. GARY S. SHAPIRO
                             219 South Dearborn Street
12                           Chicago, Illinois  60604
                             BY:  MR. JASON A. YONAN
13                                MR. SAMUEL B. COLE

14 For the Defendant:        BLEGEN & GARVEY
                             53 West Jackson Boulevard
15                           Suite 1437
                             Chicago, Illinois   60604
16                           BY:  MR. PATRICK W. BLEGEN
                                  MR. DANIEL ANTHONY RUFO
17

18
                    PAMELA S. WARREN, CSR, RPR
19                     Official Court Reporter
                     219 South Dearborn Street
20                          Room 1928
                     Chicago, Illinois   60604
21                       (312) 294-8907

22

23

24

25
```

```
 1          (Proceedings had in open court.)

 2              THE CLERK:  10 CR 747 dash 3, USA versus Antonio

 3  Evans.

 4              MR. YONAN:  Good morning, your Honor.  Jason Yonan on

 5  behalf of the United States.

 6              THE COURT:  Good morning.

 7              MR. COLE:  Good morning, your Honor.  Samuel Cole on

 8  behalf of United States.

 9              THE COURT:  Good morning.

10              MR. BLEGEN:  Good morning, Judge.  Patrick Blegen and

11  Dan Rufo on behalf of Mr. Evans, who is present.

12              THE COURT:  Good morning.

13              THE DEFENDANT:  Good morning, your Honor.

14              THE COURT:  Good morning, Mr. Evans.  All right.  You

15  may have a seat, Mr. Evans.

16              THE DEFENDANT:  Yes, ma'am.

17              THE COURT:  Whoever wishes to -- is planning to argue,

18  the others can sit.

19              Mr. Yonan, you can go first.

20              MR. YONAN:  Sure, Judge.

21              As I see the evidence in this case, Judge, through the

22  Daubert hearing, there is really a pretty narrow disagreement

23  between the two experts.  The disagreement is not about the

24  data in this case.  There is really no dispute that a phone,

25  whatever that phone number was, made phone calls, and that
```

1   those phone calls hit off of cell towers.

2          The real disputes is what that data means and how it

3   is interpreted.  And I think under these facts, Judge, that is

4   really a jury argument.  Daubert is a flexible standard in

5   which the Court is to act as the gatekeeper to establish

6   whether an expert's testimony is relevant and reliable.  But

7   the ultimate issue of the credibility and accuracy belongs to

8   the jury.

9          Now each of the four Daubert factors, Judge -- and I

10  do want to note that not all of those factors are designed to

11  apply in every single case.  But the first factors, which I

12  think is the most important, can the techniques -- have the

13  techniques been tested and can they be tested?  And I think in

14  this case the testimony was from Special Agent Raschke that the

15  techniques that he used, the methodology that he used has been

16  tested hundreds of times in practical settings.  And in many

17  ways that was the difference between the two experts, which I

18  think even Mr. Schenk admitted as well, is that Special Agent

19  Raschke was testifying from his practice, from practical

20  experience; while Mr. Schenk was testifying from a theoretical

21  perspective.

22         The fact that the FBI, the fact that Special Agent

23  Raschke himself has used these techniques, these methodologies

24  to find fugitives, to find kidnapers, to find bank robbers, to

25  find individuals in a practical setting shows that their

1    methodology is reliable, and the success achieved shows

2    reliability.

3            It has also shown by the fact that they teach these

4    methods to other law enforcement agencies.  If the

5    methodologies didn't work, they, number one, wouldn't be using

6    them; and, number two, wouldn't be teaching them to other law

7    enforcement agencies for themselves to be used.  I think that's

8    a very important factor, Judge.  I think it stands unrebutted.

9    There was no testimony to the contrary that the FBI hasn't used

10   these techniques successfully, that the FBI can't use these

11   techniques successfully.

12           The second factor, peer review, which I think the

13   defense has made a big issue of in some of the filings in

14   opposition to the government's proposed testimony, and, you

15   know, I think this has been peer reviewed.  But, frankly, this

16   not the type of testimony that lends itself exactly to be peer

17   reviewed.  This is a law enforcement technique that has its

18   best practice in law enforcement.  But I do think it has been

19   peer reviewed because the FBI uses it.  The FBI analyzes the

20   information.  The FBI uses it successfully.  They teach it to

21   other law enforcement agencies who also use it as a practice.

22   So I think that it has been peer reviewed.  I think we have

23   submitted an article to the Court showing that is has been used

24   in other settings.  And your Honor has found other articles in

25   addition, as well, where this same types of techniques and

1  methodologies have been used.  So I do think that shows peer

2  review, Judge.

3        The known or potential rates of error, I don't think

4  there has been any testimony on that front.  The testimony from

5  the FBI is they are not aware of known or potential rates of

6  error.  Their testimony is this is a successful way that we

7  find individuals.  We find individuals through using cell

8  phones.

9        General acceptance in the scientific community.  The

10  testimony from the FBI was this is what we use.  The testimony

11  from -- the FBI receives from cell phone providers is, this is

12  an accurate way to conduct these sorts of methodologies.

13        Mr. Schenk testified that this is not accepted in the

14  scientific community, but his expertise on that, which he

15  admitted, was when he reads articles on this sort of thing and

16  testifies as a defense expert.  I don't think that is general

17  acceptance in the scientific community, Judge.

18        The testimony is -- it is relevant, it is reasonable,

19  it is reliable under Daubert.  It is certainly in no way

20  outside the bounds of scientific principles.  And numerous

21  courts have held that, Judge.  I have submitted to the Court

22  testimony or cases in which similar types of testimony have

23  been upheld, have been ruled to be acceptable, in some

24  instances not even as expert testimony.

25        There has been no evidence -- the FBI is not aware of

any -- instance where this has been suppressed under a Daubert

theory.  And the defendant's arguments are really just weight

objections.  What Mr. Schenk is testifying to what a radio --

what could a -- a radio wave could do in a vacuum in theory.

That's -- I'm not saying that's not relevant, but that's a

weight objection.  If they would like to call Mr. Schenk to

testify about general theoretical aspects of radio waves, and

think that's relevant in respect to the evidence that the

government has presented, that's fine.  If they want to present

Mr. Schenk to talk about other factors that could influence why

a phone uses a particular cell phone tower, that's fine, but

that's weight.  That goes to the jury's ultimate conclusion of

what's at issue here.

          The government doesn't have to prove, and the

government isn't even -- you know, Special Agent Raschke isn't

testifying or didn't testify or wouldn't testify at trial that

the phone is located at that house.  He's testifying about

general principles of cell phone and general principles of

where people -- you know, where these phones were expected to

be located with someone using those towers.

          So, your Honor, I think in summary -- but I do think,

I will say this about Mr. Schenk, and if you would like us to

address this afterward, we can do that.  There are aspects of

his testimony that I don't believe meet the Daubert standard.

And if you want me to address that now or if you want me to

1  address it later --

2      THE COURT:  Well, you haven't really moved to exclude

3  him as a witness.

4      MR. YONAN:  Well, I wouldn't move -- I would not move

5  to exclude him as a witness, Judge.  What I would suggest to

6  the Court is, if he is going to testify, that Mr. Blegen

7  informs the Court in to what areas he is going to go into

8  because I do think some of the testimony does not meet the

9  Daubert standard, particularly his testimony about the call

10 detail records and what goes in and what potentially is not on

11 call detail records.  He essentially testified that he -- his

12 only knowledge of that was from him -- testimony he heard in

13 another case.  That's not reliable.  That's not scientific.  He

14 has no basis to be an expert on that.

15      I'm not moving to exclude him under Daubert.  If you

16 want to -- if they want to call him to testify about, you know,

17 theoretical principles, that's fine.  But that specific aspect

18 of his testimony regarding the call detail regards, there is no

19 basis for that testimony.  It is wrong, first of all, and he's

20 got no basis to testify to it.

21      THE COURT:  Okay.  Well, we'll put that in the mix of

22 issues.

23      MR. YONAN:  Okay.

24      THE COURT:  Really there are only a couple things

25 here, Mr. Yonan, that bother me about Agent Raschke's

testimony, and that was what I raised with him yesterday about
the map and the overlap area.

Now if you will look at this article that we sent you
about -- that came from the U.S. Attorney's -- or the
Department of Justice, the O'Malley article, using historical
cell site analysis evidence in criminal trials.

MR. YONAN:  Yes.

THE COURT:  At page 28 -- no, no.

Yes?  Sorry 27, I believe it is.  The very last
paragraph.  Well, and the -- well, under paragraph B, cell
tower locations and sector orientation.

Do you see that?

MR. YONAN:  Yes.

THE COURT:  And it says the radius of RF signals
around the cell tower can vary considerably.  But many towers
have a radius of several hundred meters to several miles.  So I
think everyone agrees that that's true.

Now then it goes to RF mapping.  And this author says,
the second sentence of the second paragraph, mapping the
directional orientation and angle of coverage of cell tower
sectors is based on the cell provider's business records and
mapping of the range of cell tower sectors is based on the cell
providers's plan and engineered RF coverage and basic
principles of wireless communication.  And then it refers you
to this picture on the next page.

1       And then it says, actual RF coverage may be available

2   from some cell providers who measure actual RF coverage within

3   certain cell sectors and maintain business records of actual RF

4   coverage measured to those cell sectors.  Otherwise industry

5   standard equipment and software must be used by trained

6   individuals to measure and record the actual RF coverage

7   footprint within a particular cell sector.

8       Now what I was getting at with Agent Raschke yesterday

9   was how did you get the sectors?  That is, it is perfectly

10  intuitive to me to think that that radio frequency wave is

11  diminishing as it gets bigger.  But does the scope of his

12  overlap area, is that based on anything other than, I think he

13  said, you know, this is my estimate?

14      But that -- apparently from this paragraph, I think

15  you could actually tell us that.

16      MR. YONAN:  Well, there is -- they can do what's

17  called a drive test of a tower, where they actually mount

18  equipment on a car, drive around the tower or drive around the

19  other areas for a very precise -- this is the actual range as

20  we have determined by the drive tower.

21      The government's position in this case was, we do not

22  need that level of precision because the house is right in the

23  middle of the two areas.  And that's why he is using his

24  approximation.  We're not -- you know, there are absolutely

25  ways to get this -- this call was in this area or this is the

1    exact sector.  We're approximating it because it is so clear it

2    is hitting off these same two towers each and every time during

3    this time period, except for those instances where there is the

4    other, you know, junk tower around Midway Airport, and we have

5    addressed that.

6         But from our perspective we didn't get to need to do

7    that level of precision because of the frequency of the calls,

8    Judge.

9         THE COURT:  Okay.  So you're saying -- are you saying

10   or will your agent testify that because the calls hit off these

11   two towers or one of these two towers every time, that he must

12   have been within the range of these two towers?

13        MR. YONAN:  The coverage these two -- when he sees a

14   phone consistently using these two towers, it indicates to him

15   based on his experience that it is in the coverage overlap area

16   of those two towers.

17        THE COURT:  But the coverage overlap area is much

18   larger than what his map suggests, it is not?

19        MR. YONAN:  Well, I don't know that it is.  I don't

20   think it has to be much larger.  I think -- what he's doing is

21   using his experience based on the location of the towers to

22   determine what that coverage overlap area is.

23        THE COURT:  Okay.

24        Now the other issue -- and, Mr. Blegen, you'll be able

25   to respond to these too --

1    MR. BLEGEN:  Good.

2    THE COURT:  -- but two witnesses have a disagreement

3    about how that cell or that radio frequency gets to the

4    switching system.  So I would say that one is correct and one

5    is incorrect.  I mean, it has to be that way, right?

6    MR. YONAN:  I would agree with that, Judge.

7    THE COURT:  So why do I believe you instead of the

8    other witness?

9    MR. YONAN:  Well, because my witness actually has

10   practical experience.  He has actually talked to people

11   who -- network operators, and he's not sitting in the

12   background of a courtroom listening to someone testify, and

13   then testifying under oath that he is an expert and he knows

14   about it.

15   There is no basis for that testimony at all from

16   Mr. Schenk.  He had no idea what he was talking about.  And he

17   admitted that his only basis to testify was he heard somebody

18   else testify about it.  That is not expert testimony.  That

19   doesn't meet Daubert.  That doesn't mean basic foundational

20   principles, Judge.

21   THE COURT:  All right.  But if he testifies, and I

22   haven't yet heard he is going to be called, are you objecting

23   to his testifying to that?

24   MR. YONAN:  That is what I mentioned, Judge.  He is

25   not qualified to testify to that.  He cannot -- my opinion

1  would be that he cannot testify to that.  He has no basis to

2  testify to it.  He doesn't meet Daubert under that standard,

3  and he doesn't meet the average -- the regular foundational

4  requirements of any witness under that standard, Judge.

5          THE COURT:  Okay.  So does the cell tower send out

6  radio waves or is it just receiving them?

7          MR. YONAN:  It receives -- obviously I'm not the

8  expert, Judge.

9          THE COURT:  Yeah, I know.

10         MR. YONAN:  But listening to the testimony, it

11 receives the radio waves from the phones.

12         THE COURT:  It isn't emitting.  I know your witness

13 said exactly what you are saying.  But is there anything in the

14 literature that you know of the cell tower emitting signals,

15 trying -- and that the cell phone is somehow receiving them?

16         MR. YONAN:  If I am remembering the testimony

17 correctly, the cell phone is constantly scanning for the

18 strongest signal from a tower.  That's as I see it.  You know,

19 the agent is here, Judge.  I am obviously not the expert on how

20 it works.  But my understanding is -- it is -- the phone is

21 sending the radio waves to the tower, and it is being accepted

22 by the tower.  Now --

23         THE COURT:  And what does the signal actually mean in

24 terms of, you know, electrical that's happening?  Can you tell

25 me that?

1          MR. YONAN:  I'm sorry, what do you mean, Judge?

2          THE COURT:  Well, when you say the tower that is

3   sending out the strongest signal is actually emitting something

4   then.

5          MR. YONAN:  The --

6          THE COURT:  You may need to talk to --

7          MR. YONAN:  May I have a moment, Judge?

8          THE COURT:  Yes.

9       (Brief interruption.)

10         MR. YONAN:  Well, I can certainly -- it might be

11  easier, Judge, to just -- if it is okay with counsel -- I think

12  I can testify to what the agent -- I can tell you what the

13  agent just told me.

14         THE COURT:  Okay.  This is a proffer.

15         MR. YONAN:  I mean, the tower transmits and receives.

16  So it receives signals, and it is also looking at the locations

17  where the phone is located, Judge.

18         THE COURT:  So it is a two-way communication.

19         MR. YONAN:  That's correct, Judge.

20         THE COURT:  Okay.  So -- all right.  Let me hear from

21  Mr. Blegen.

22         MR. BLEGEN:  Judge, I -- with all due respect to the

23  FBI, this technique that they are using is eyeballing, and

24  that's what it is.  It doesn't come close to meeting Daubert.

25  The article that you emailed last night, which I am embarrassed

to say we did not find, we have had the other two, but the

technical article from the Digital Investigations, that

article --

THE COURT:  Yes.

MR. BLEGEN:  -- that makes perfectly clear that the

methods which should be being examined by courts under Daubert

are far more scientific and technical than what the agent used

here.

The conclusion of this article is that even these

techniques which use radio frequency devices, things called

Stingrays, which use network engineers with computers and

devices that can read radio waves, those things are not even

accurate and should be tested under Daubert before they are

admitted into court.

But that's -- they are not even coming close to asking

to use that here.  They are using nebulous eyeballing.  The

agent finds out where the towers are, and then he says, oh, I

think that the range of these things is this far, and,

therefore, this is the overlap.

If you notice on the very first page of that article

that you found, they say that the sectors that are drawn with

perfectly straight lines and perfect circle arcs, that's wrong,

not even true.

The sectors are these amoeba looking things that you

see on page 186.  That's the same sectors.  It is right in the

middle of the paragraph -- or in the middle of the page.  Each

sector will provide service over a particular geographic area,

and this area will not be uniform; that is, it will not be a

circle, a triangle or any other regular shape.

THE COURT:  All right.  But it will be generally

located around the cell tower.

MR. BLEGEN:  Absolutely.  And Mr. Schenk testified to

that.  And, you know, we heard some Mr. -- some criticism of

Mr. Schenk today.  But in the articles that you found, only one

of our experts was ever cited, and was Mr. Schenk, not an FBI

agent, and not Agent Raschke.  Mr. Schenk is cited in the Law

Review article that you found.

And I'll get to my broad Daubert point in a second.

But I'm very frustrated over this criticism of Mr. Schenk

because what they are saying is he can't testify to something

that he heard said under oath in another trial, but Agent

Raschke can testify that he heard something from someone at a

cell phone company, who he cannot name, did not know on the

stand, and said he would never be able to find the person's

name.

So we're on the same level there, at the very least

of, you know, establishing just a basis to get the testimony

in.  He doesn't even know the names of the people.

And in other cases, they call a network engineer to

come in to testify to these kind of things.  And he won't --

1    they won't say the same thing that Agent Schenk is saying, they

2    will say things similar to the article that you found.

3          But to get back to the broad point, they have the

4    burden of proof to get this admitted under Daubert.  And they

5    have to show, also under 702, that the expert's scientific,

6    technical or other specialized knowledge will help the trier of

7    fact.  I agree that if it were specialized knowledge, it could

8    help the trier of fact.  Obviously, if you can show where a

9    cell phone is, that could help somebody.

10          But number two is, the testimony is based on

11   sufficient facts or data.  He does not have sufficient facts or

12   data.  All he knows is the location of the tower.  And even

13   under the article that you found, there are numerous other

14   factors that they are ignoring.  And that, with all due respect

15   to Mr. Yonan, does not go to the weight of the evidence, it

16   goes to admissibility under Daubert.  This is not some piece of

17   non-technical evidence that you could argue, oh, it goes to the

18   weight.  This document may not be 100 percent authentic because

19   it has got some lines through part of it or you can't read all

20   of it or a tape that is a recording, you can't hear

21   everything.  There are empty spots.  That goes to weight.

22          Putting in some sort of scientific opinion, you have

23   got -- weight is not the issue, the issue is does it meet

24   Daubert.

25          Here's some other, from the article that you talked

about or that you found, and that Mr. Schenk talked about are

some other things that the agent is missing.  He didn't take

into the account the height of the antenna.  On the article

that you found on page 186, you have to take into account the

height of antenna, the power used, the location of other cells,

the geography of the land.  He tried to do that using Google

Maps a little bit, including surrounding buildings.  He didn't

take that into account either.

        The only time -- the only thing he said about that is

I have been in that neighborhood hundreds of times, and I know

what kind of buildings are there.  But we're talking about a

scientific method here that they have not attempted to

establish, and they don't have all -- they haven't even used

all the factors to establish their methodology.  This is not an

issue of weight, it is whether it is a methodology.

        According to the Seventh Circuit, a very significant

Daubert factor is whether the proffered scientific theory has

been subjected to the scientific method.  Bradley versus Brown,

42 F.3d 434, Seventh Circuit 1994.  They have not subjected

this one iota to the scientific method.  The scientific method

is not talking to your friends at the FBI at the water cooler

and saying, hey, this is a great technique, it really works.

If the FBI wants to subject this to the scientific method, they

should do what scientists do.  I'm sure they have scientists

working for them or they can hire some of them.  They develop a

hypothesis, and then they test it to see if it is true, not
after the fact, oh, this is really good for investigations.
That's what Daubert requires you to do.  Peer review, while not
determinative, meaning there are cases that say without peer
review you don't automatically exclude scientific evidence,
peer review is very important.  Peer review subjects the
supposed science to the scientific community.

The FBI hasn't published anything on this.  And your
peers are also not your friends at the FBI, they are other
people who are unbiased, people who don't necessarily share the
same goals that you do, who necessarily don't share -- have the
same biases that you do, have the same desire to say, oh, we
can do this very easily.  That's what peer review is.  And they
haven't done any peer review at all.  They have not subjected
it to error rates or testing, also required by Daubert.

By saying -- and I -- the testimony that he -- Agent
Raschke says, I don't know about any time that this didn't
work, that's not sufficient.  That's not error rate testing.
If I asked him, did you ever ask anybody, hey, have you ever
come across a time that this didn't work?  And he said, no, he
never asked anybody that.

So even if you could somehow say that this sort of
internal FBI, this really works, is some sort peer of review,
it is not because you didn't even ask the relevant question of
anybody.  You did never say, hey, you know, did you ever try

this once and it didn't work?

And this case is a pretty good example of it. They didn't find the cell phone within this radius. They are presuming that it was in there. But it wasn't. I mean, it wasn't or it may not have been or, more importantly, they don't know.

The government has also suggested that there are other cases where they have been cited where this has been allowed. One of those cases was discussed in the Law Review article that you also found. And I am surprised that the government cites this case, but it is Alems. And it is discussed in the Law Review article on page 70.

In that case what the agent did was that he got the exact same kind of phone, and he drove around. He put the phone in engineering mode so it would display in realtime the connecting sites. Simultaneously he used a device called a Stingray to measure from his location the cell site with the strongest signals.

He did all of those things. Finally he drove around the area, the surrounding cell sites, to approximate its coverage area and points hanging on, but all the time using these devices, meaning the same phone in engineering mode, telling me which towers I am communicating with and this Stringray device. There is nothing like that here.

The agent got some maps out with points and decided to

a draw a circle and said, this is where the estimated range
is.  That does not come close to meeting Daubert.  And it is
not an issue of weight, it is issue of admissibility.

The Seventh Circuit has emphasized how important the
scientific method is.  I have said that before.  They have in
previous cases thrown out testimony because it didn't meet the
scientific method, Chapman versus Maytag, 297 F.3d 682.

Daubert itself talks about the importance of
submitting it for peer review.  Submission to the scrutiny of
the scientific community is a component of good science in part
because it increases the likelihood that substantive flaws in
the methodology will be detected.

Here we don't even really have a methodology.  There
is not, I guess, it is -- the name of methodology is
granulization, but we couldn't find anything saying
granulization has been applied to scrutiny, none of that
stuff.  And it is -- what has been applied to scrutiny are the
things that have been discussed in the article from the United
Kingdom that you found, and all of those -- each -- I spent
more time than I care to admit reading this last night and
trying to figure it out.  But what I did conclude is that all
of these things, all of the methodologies used in these
articles require devices or -- or and the testimony or the --
the work from a network engineer.

But what I think the government is doing, the FBI is

1  doing, is they are combining a couple of the very basic

2  methodologies that are found on page 188 of the article, but

3  not really doing all of them.  It looks to me like they are

4  kind of combining the assessing service areas with the best

5  server prediction plots method, but they don't use all of the

6  requirements for either of those methods.  All the other

7  methods are under the radio frequency measurement surveys, and

8  all of those require devices.  And even then, even then using

9  devices, as you saw in the article, they did a test in the UK

10  where they had several phones in like a parking garage.  Even

11  then phones that were right next to each other were reading

12  different cell towers.  And once you know that, once you know

13  that there is no certainty, even remote certainty to which

14  tower a cell phone is going to use, that it is not necessarily

15  based on proximity, not even close, and it is not even based on

16  strength of signal because those things can be overwritten by

17  various things, like line of sight, then you know that this

18  supposed section is frankly nonsense, and it is certainly not

19  good enough to be admitted in court.

20          There was a significant disagreement, and I think we

21  have the answer now, over the recording which cell tower gets

22  recorded.  And Mr. Yonan said that Mr. Schenk is absolutely

23  wrong about that, he's wrong about how the mobile switching

24  center works, and he's wrong about what gets recorded.  Well,

25  the articles that you found say that Mr. Schenk was right.  And

it is -- I read through it last night.  Their own U.S.
Attorney, the guy who wrote this article, talks about the
mobile switching center.  It is on page 20 of the article.  It
is about three quarters of the way down the page.  The third
component of a cellular network is the mobile switching
center.  The mobile switching center is the brains of the
cellular networks.  It routes voice calls.

THE COURT:  Well, I think no one disagrees with that.

MR. BLEGEN:  Well --

THE COURT:  The question is does the signal get to the
computer before it gets to the cell tower.

MR. BLEGEN:  That's where the guys from the UK come
in.  On the very first page of the article from the UK, these
gentlemen say that, regarding the recording details, the
details vary between networks, but it is usual that only calls
which have been connected for longer than a set period of time,
typically over one second, are included in the record.  And
some networks may show details of both ends of a given call.

So what the agent said is that the cell phone connects
to the tower with the strongest signal, and then immediately
because of the mobile switching network's decision, could get
transferred to a different tower.

This paragraph suggests, no, they -- I'm sorry.  And
then that -- it is that first tower that is recorded.  This
paragraph suggests that Mr. Schenk is right.  That, no, it is

1    only calls, connections of more than one second that get

2    recorded.

3         But it doesn't stop there.  They discuss again in the

4    section that is discussing directed retries, and that is page

5    187.  I won't read the whole thing.  But on the paragraph to

6    the right on page 187, they are talking about the redirection

7    or the direction of a call to a certain tower.  And at the end

8    of that -- the paragraph that talks about it, these gentlemen

9    say, the CDR, and that's the records that we are talking about

10   here, may highlight the alternately selected cell as the

11   setting -- starting cell ID for that call.

12        So this article doesn't tell us with 100 percent

13   certainty that Mr. Schenk is right, but it does tell us with

14   100 percent certainty that Agent Raschke is wrong; that is, his

15   testimony that, no, the first tower that has any communication

16   at a call is what is recorded on the CDR.  This article says,

17   at the very least it may be the alternately selected cell as

18   the starting cell ID for that call.

19        MR. YONAN:  And I would just direct the Court's

20   attention --

21        THE COURT:  That doesn't mean it -- sorry.  Just less

22   than a second it doesn't the get recorded anywhere.

23        MR. BLEGEN:  Correct.  So it --

24        MR. YONAN:  And --

25        MR. BLEGEN:  So if it goes to a cell for less than a

1  second, and it is obviously not going to take long, and it gets

2  redirected to a certain tower because of communication traffic,

3  that first tower is not going to be recorded.

4       THE COURT:  Right.  But that doesn't mean that there

5  isn't a switching system that comes in after that second

6  tower.  That is, the first one just doesn't exist in terms of

7  the --

8       MR. YONAN:  Judge, I would direct your attention to

9  part two, right underneath what Mr. Blegen is reading, call

10  detail records would indicate the first and sometimes the last

11  cell, which a mobile phone connected to at that time and date

12  of the given call or text.

13       MR. BLEGEN:  But that's different than the tower that

14  it uses to communicate with the mobile switching device, and

15  then gets sent to a different tower because of network traffic.

16       MR. YONAN:  But --

17       MR. BLEGEN:  That's the --

18       THE COURT:  Well, right.  But it is the one with

19  the -- it is the one with the strongest signal.  I don't think

20  that -- well, I'll have to study this more carefully, but I

21  don't think that --

22       MR. BLEGEN:  Can I just say that --

23       THE COURT:  -- Mr. Yonan is wrong or Agent Raschke.

24       MR. BLEGEN:  Well, but the premise is wrong.  What

25  he's saying is the mobile switching device, mobile switching

1  center is relevant.  It doesn't matter if Sprint decides to

2  send you to a tower that's not the strongest signal or that's

3  farther away, et cetera, because -- in the FBI's view --

4  because the first tower that you connect to when that decision

5  is made is the one that is recorded.  So, therefore, the CDR,

6  the only records they have here, will say, oh, this tower.  But

7  that's according to this article and Mr. Schenk.  So now we

8  have two authorities instead of one.  That's not accurate.

9       The call would have to be more than a second connected

10  to the first tower, and this article says that -- now obviously

11  each cell company is different -- but that this one, the CDR

12  may highlight the alternately selected cell as the starting

13  caller, starting cell ID for that call, and that means that --

14  Mr. Rufo made good a point too.

15       But that means that it is not going to be the nearest

16  one of the one with the strongest signal, but the one selected

17  by the network.  Mr. Rufo also pointed out to me, just above

18  that, that Agent Raschke's testimony is also wrong IN that

19  -- the handset will not necessarily be connected to the

20  strongest cell detected there.  And that's -- that's the point,

21  Judge, and that's --

22       THE COURT:  That's because it has been switched

23  because of traffic.

24       MR. BLEGEN:  Correct.  And that's -- our position is

25  the one it is switched to is the one that is first recorded,

and this article suggests that Agent Raschke is not right, and Mr. Schenk is correct.

What we have here, Judge, is a -- what we have got is what the Seventh Circuit has previously called and the Maytag, Chapman versus Maytag case, nothing more than unverified statements, unsupported by scientific methodology. That's what we have. He drew some shapes that are not accurate, because they are not going to be perfect geometric shapes. We know that. And he drew them in places that are not -- that he has no basis in science, measurement, mathematics or anything else to say, this is where the circle should end or even close to where the circle should end. They have -- he has no basis to say that. What he has said is training and experience. Those are not scientific.

And he's also said that he spoke to people, but we don't know who those people are. We don't know what their qualifications are. We don't know what they know or would say about this method. But I will tell you in the case of Indiana that we have talked about previously and was discussed before -- and this is a case where Judge Moody in Indiana allowed it in after having a Daubert hearing. The name of the case is Benford --

THE COURT:  Yeah.

MR. BLEGEN:  -- they did more, significantly more than what was done here. They had a network engineer come out. He

used tools.  He talked about the range of the network.  He
talked about tests and put in evidence of tests that were
constantly run on phones and towers.  He did all of those
things.  But even then they didn't use the -- the testimony
wasn't admitted to get this narrow overlap, like we have here,
the testimony was only used to exclude the guy from being in
another state.

THE COURT:  Well, right, it was a different issue --

MR. BLEGEN:  A different method --

THE COURT:  -- so you might need to use a different --
somewhat different method.

Let me just say, I think -- well, let me ask you this,
Mr. Blegen.  There are some things that are not necessarily --
you can allow an expert without all of this peer review and so
on.  And, for example, a carpenter learns how to build a
stairway.  He wants to know how so -- he or she, I should say,
but I'll say he because most carpenters are men -- will read
the books, they will go to their, you know, how to, and they
will build some stairways, and they will figure out how to do
it, and they have never really studied physics or whatever
else, but that's obviously what's involved.  But that carpenter
can come in and testify about how to build a stairway or why
this stairway is a bad stairway because he has training and
experience in building stairways.

So a lot of what's going on here with Agent Raschke is

to sort of set out the principle of how cell phones work. But
I don't think your two experts really differ very much on
that.

The general principal is that we have these cell
towers -- that are just intuitive. We have these cell towers,
and they are spaced throughout the city in order to provide
coverage. And if a cell phone is in an area, it is going to
hit on -- it is typically going to hit on the cell phone tower
that is close to them, a cell -- there are exceptions to this.
But if that weren't the case, we wouldn't have them throughout
the city in very -- you know, well spaced. That's why we call
them cells, I guess, because that is a tower that covers a cell
in the city. So, I mean, if either expert were asked to
testify about that basic principle that would be true.

Now I don't think that the government is saying that
it is absolutely certain that the phone was in this area but
would be saying -- the witness would be saying it is more
likely than not that it was in this area or the phone was in
this area.

Now neither your expert or the government's expert is
scientifically qualified to talk about this really. I mean,
both of them know this because they -- at least Agent Raschke
has worked with this, and he's -- you know, he's studying this
whole thing.

Now obviously I understand what you are saying, that

1    the law enforcement community is not a peer group, a scientific

2    peer group.  But your witness is even less, you know,

3    experienced with cell phone technology.

4         So I guess I'm kind of in a quandary here about --

5    yes, I think it would be better to have a network engineer

6    coming in here and telling us this.  But is it such

7    sophisticated technology that we really need that?

8         MR. BLEGEN:  Judge, if they would give us the name of

9    one of the network engineers that they talked to, we'd put a

10   subpoena on them, and then we could find out.  But we don't

11   know because they haven't given us the names.  I find it very

12   surprising that the FBI, who writes more reports than any

13   agency I have ever seen anyway, doesn't have reports about who

14   Agent Raschke discussed this with, doesn't have network

15   engineers whose names we can be given.  Sprint or Nextel,

16   who -- we could find out who they are, who said that these

17   things work, who confirmed Agent Raschke's testimony about

18   these things.  If they'd give us the name of a network

19   engineer, we'll put a subpoena on the network engineer.  I

20   don't think they are going to say this to the same extent.

21        I respectfully disagree about Mr. Schenk's

22   qualifications.  I think he is eminently qualified.  He didn't

23   simply receive some training from other law -- from law

24   enforcement agencies.  He is -- not only does he have various

25   degrees that make him qualified, he works setting up the

original -- the precursors to cellular phones.  He has worked
with radio frequency with the Navy.  I won't go through all his
qualifications again.

         And I disagree that, generally speaking, the closest
tower is the one that you would hook to.  The article that you
found says to the contrary, that it is not.  And there are
various reasons for that.  And one of the reasons is simply how
they angle their antennas.  They could be -- I could be very
close to a tower, but they have it angled at such a way to
exclude me for reasons of their own.

         THE COURT:  But in this case -- well, how does that
apply in this case?  We know that that cell tower -- you're
saying he could have been in a remote location or the phone
could have been at a remote location and still hit on the
cell?

         MR. BLEGEN:  What I am saying is that tower or towers
could have been selected for reasons other than proximity.

         THE COURT:  Right, okay.

         MR. BLEGEN:  Yes, it does have to be sort of in a
general nebulous amoeba-shaped area emanating out from that
antenna, but it could have been much closer to one of the other
towers, but selected this tower because of either the phone
company's decision or line of sight.

         One of the other factors that, again, discussed in
this UK article is whether the -- and some big factors --

whether the phone was in a building or not.  That completely
throws off this line of sight, best signal, all of these
things.  And they believe that the phone in question was in
somebody's basement at the time it was making the calls, and
they haven't taken that into account at all.

I don't want to waste a lot more of the time, Judge.
I don't think this comes anywhere close to Daubert.  It
is -- there is -- the method is estimated.  And taking your
carpenter analogy into context, carpentry has been around for
hundreds and hundreds of years, and carpenters have viewed
other's work and those kinds of things.  This is new.  And this
government method, the FBI's method of trying to draw two
circles together is new.  It is not science.  And it is going
to go the way of things that have been -- that are starting to
get rejected now.  It is going to go the way of shaken baby
evidence, that was believed to be sacrosanct up until
recently.

That's -- this stuff is even farther afield from that
because there is no science or math or measurement to it.  It
is -- the agent, as he said candidly on the stand -- you said,
how did you get -- how did you draw the end of this circle?
And he said, I estimated it.  That's not science, and it
shouldn't be permitted under Daubert.  It is not admissible.

THE COURT:  Okay.  You get the last word.

MR. YONAN:  Well, if I am understanding Mr. Blegen

correctly, Judge, we're disputing two parts of Government

Exhibit Summary 6. The other stuff about -- well, his own

expert said, typically it would hit the closest tower, not

necessarily. And nobody is saying it has to necessarily hit

the closest tower. Agent Raschke didn't say that. That's

weight, Judge.

He took -- and the fact of the matter is it hits these

-- the towers that show up in these charts, it hits these

towers. If Mr. Blegen wants to get up and talk to Agent

Raschke about other factors that could influence why a phone

hits a tower, that goes to weight.

So that leaves us with these two estimations here,

Judge, on Government Exhibit Summary 6. For a phone that used

those two towers, almost 200 times over a 36-hour period, those

two towers -- and you're right, Judge, in that the government

is not saying that the phone was in the basement. It is saying

it's in this area. And that's going to corroborate other

evidence in the case.

So the government is not saying, look, it shows that

he did it because the phone is there. It's corroborative

evidence. And if it is not going to hit that tower, it is

going to hit another tower in that area. It's being used to

generally show this person's location.

What Mr. Blegen has ignored in crossing Agent Raschke

and has ignored here today is the practical successes that the

1  FBI has had using these techniques.

2       THE COURT:  Well, this -- I'm not too persuaded by

3  that because of all the material that's coming up about

4  fingerprint evidence where, you know, the agent would get on

5  the stand and say that this is absolutely, you know, 100

6  percent accurate.  And now, you know, there is -- coming up

7  with information that maybe that wasn't so true.  So you -- and

8  you haven't really presented me with any actual cases, you just

9  say, you know, it always works.

10      MR. YONAN:  Well, he -- Agent Raschke testified he

11  himself has used these techniques to find kidnapping victims,

12  to find fugitives, to locate people.  That's real life

13  practical successes.  That's working with these records,

14  working with these estimations and determining where people are

15  located.

16      Now with respect to the conversation with the network

17  engineers, he talks with them all the time because he uses

18  these in a practical sense.  He's not like Mr. Schenk who is

19  one guy who reads articles and then testifies about cell sites

20  and fingerprints and photographic evidence.  He uses this on a

21  day-to-day basis.  This is what he does for a living.  That is

22  the practical expertise that is required of him, and it is

23  required of the agents that he works with.  To me it is apples

24  and oranges.

25      Mr. Schenk can talk about -- all he wants about

theoretical bases for why a radio wave hits off a tower.  But he's never looked at these call detail records to try and find someone.  He looks at them to try and basically testify as an expert for criminal defense attorneys.

THE COURT:  Well, all I want to do is submit this so it is not a fight in front of the jury.  That is, I would like it to be clear that what each person -- are you going to call Mr. Schenk?

MR. BLEGEN:  I don't know.  It sounds like maybe you're heading in a direction that might require me to call him.  But, yes, I'm hoping not to because I don't think it is admissible.  I also hope that the government doesn't think it can admit testimony from agents saying this works all the time without providing some basis of fact for that, like a database in the FBI, maybe they keep track of how this works.  They probably should if they want it to be admitted at a trial.

What we are hearing is anecdotal word-of-mouth evidence.  That's not admissible.  That's not admissible at a trial, and it shouldn't make it admissible under Daubert.  But, yes, I hope to call him.  And maybe we'll try to find our own electrical -- or network engineer if they refuse to give us the names of the ones they consult with.  I think they should have to --

MR. YONAN:  And for the record --

MR. BLEGEN:  -- if they are relying on those people.

1          MR. YONAN:  -- Mr. Blegen has never asked, just for

2     the record.

3          MR. BLEGEN:  I asked the witness.

4          THE COURT:  Well, maybe the witness didn't know on the

5     stand.  You know, that's a whole different thing.

6          MR. YONAN:  Judge, one other point, Judge, and it is

7     your analogy about the carpentry work.  Agents testify as

8     experts on all sorts of things that aren't necessarily rooted

9     in scientific basis.

10          THE COURT:  Like what drug terms mean.

11          MR. YONAN:  Exactly.  That's exactly what I was going

12     to say, Judge.  They testify all the time about what their --

13     their practical training and experience reflects.  And that is

14     expert testimony under 702, and it is admitted consistently and

15     routinely, Judge.

16          THE COURT:  All right.  Well, I had hoped to be able

17     to decide this today, but I -- I do want to just spend a little

18     more time with it.

19          MR. YONAN:  I'm certainly not offering this, Judge,

20     but we can do Summary Exhibit 6 without the coverage overlaps.

21     If that's what's giving you the hang up -- because the fact of

22     the matter is the phone hits off of those two towers for an

23     extended period of time.

24          THE COURT:  Well, that might help, you know, and

25     I -- I'm just not persuaded that -- yet that the radius of that

1  or -- yeah, I guess that's what it is -- is based on anything.

2  In fact, the witness said it was just his estimate.

3       MR. YONAN:  But short of that --

4       THE COURT:  It looks like there is a way to measure

5  it.  At least that's what your article says from --

6       MR. YONAN:  Short of that, Judge, I don't know what

7  the dispute is here, that a tower could somehow use -- I mean,

8  Special Agent Raschke should still be able to testify based on

9  this chart that in his experience when a phone hits --

10 consistently hits off of two towers for a long period of time,

11 that it is in the coverage overlap area of those two towers.

12 That's reasonable, reliable, relevant testimony.

13      If it is the actual spheres that is causing the whole

14 concern, we'll take them out.  And -- or the testimony is going

15 to be, it hit off of these two towers for this amount of time,

16 and in my training and experience that means that that call is

17 in coverage overlap for those two towers.  I think Mr. Schenk

18 basically testified to as much at trial, Judge.

19      THE COURT:  Yeah, I think he did too.

20      MR. BLEGEN:  And, Judge, I just don't want my silence

21 to be taken as not objecting.  I object to all of their

22 exhibits, even the ones that simply say here's a tower and

23 here's -- I think it is like the location where the victim was

24 supposedly kidnapped and then drawing a line, because that type

25 of evidence is not -- I agree you don't have to have scientific

knowledge to say where a cell tower is, what phone hit it, and
then draw a line somewhere.  But that sort of evidence is not
relevant without the other underlying things that they are
going to say, which is, and typically it hits off the tower
with the best signal, and I think this is the one that would
have had the best signal.  None of that is relevant to a jury
without the other information, which we think is -- they have
the testimony, which is not admissible under Daubert because it
just isn't accurate.

MR. YONAN:  Well, their own expert said it was --

THE COURT:  Okay.  I think --

MR. YONAN:  I mean, I --

THE COURT:  -- I heard enough.

MR. YONAN:  And, Judge, I'm happy -- if it is going to
expedite the Court's ruling on this, we'll do a Summary Exhibit
6 without the spheres.  I disagree with Mr. Blegen.  I think
his own expert basically agreed by and large with everything
Agent Raschke said, everything else Agent Raschke said.

Now if he wants to get up and cross Agent Raschke
about other factors that could have been used for why this
particular tower is -- that's why we have a jury trial, Judge.

MR. BLEGEN:  Then we wouldn't need Daubert.  Why do we
have Daubert?  Everything goes to weight.  Let's put any kind
of wacky scientist up there, and they can say whatever they
want.  And, I could say, well, gees, you didn't take this --

1    THE COURT:  All right.  I will do my best to make the

2 right decision.

3    MR. BLEGEN:  Thank you, Judge.

4    MR. YONAN:  Would you like to us come back, Judge,

5 or --

6    THE COURT:  We'll let you know if we want to do it in

7 open court.  I'll have to get to it right away.

8    MR. YONAN:  Thank you.

9    MR. BLEGEN:  Thank you.

10    (Which concluded the proceedings in the above-entitled

11 matter.)

12                        CERTIFICATE

13    I HEREBY CERTIFY that the foregoing is a true, correct

14 and complete transcript of the proceedings had at the hearing

15 of the aforementioned cause on the day and date hereof.

16

17 */s/Pamela S. Warren*                September 7, 2012
   Official Court Reporter              Date
18 United States District Court
   Northern District of Illinois
19 Eastern Division

20

21

22

23

24

25